Marsha Marie MAY et al., Appellants,

v.

UNITED STATES of America, Appellee.

Paula JONES et al., Appellants,

v.

UNITED STATES of America, Appellee.

Duane WAGGONER et al., Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 19611, 19626, 19627.

United States Court of Appeals Eighth Circuit.

Nov. 20, 1969.

James J. Sauter, of Deeba, DeStefano, Sauter & Herd, St. Louis, Mo., for appellant May.

Douglas W. O'Neill, St. Louis, Mo., for appellants Jones and Waggoner.

Irvin L. Ruzicka, Asst. U. S. Atty., St. Louis, Mo., for appellee; Daniel Bartlett, Jr., U. S. Atty., on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

This case reaches us by appeal from a judgment rendered by the United States District Court for the Eastern District of Missouri in consolidated tort claim actions tried pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Involved is the liability stemming from alleged negligence of one James Andrew Digar, the driver of a United States mail truck, by reason of a collision with a Plymouth automobile driven by James L. Meeks, the collision occurring in a residential area in the City of St. Louis. The Honorable Roy W. Harper, United States District Judge, in a well-considered opinion published at 292 F.Supp. 576 (E.D.Mo.1968) held that the collision resulted solely by reason of the negligence of Meeks, that Digar, the driver of the Government mail truck, was free of negligence, and that the Government was therefore not liable for any damages. We affirm.

Meeks was the driver of the Plymouth automobile southbound on Minnesota Avenue and Digar was the driver of the United States Post Office Department mail truck westbound on Mott Street. Plaintiffs were all passengers in Meeks' Plymouth. There was testimony to the effect that Meeks was driving in a careless and negligent manner at a speed of 50 to 55 miles per hour and continued at this rate of speed without slowing before entering the intersection. He saw the mail truck only an instant before the collision and apparently attempted to swerve as the left rear of his car struck the right front of the mail truck.

There were two disinterested eyewitnesses to this accident. Patricia Brown was sitting in a Chevrolet in front of her next door neighbor's house exactly 162 feet north of the intersection of Minnesota Avenue and Mott Street. Her attention was first attracted to the Plymouth when she heard "this racing of a motor type thing" and a "hum type thing" so she turned around to see what the noise was. The Plymouth at that time was in the block behind her. This would put it in her view about a block and a half away from the intersection of Minnesota and Mott where the collision occurred. Mrs. Brown continued to watch the Plymouth

as it came abreast of the car in which she was seated on the north side of Minnesota Avenue and until the collision occurred. She estimated the speed at 50 to 55 miles per hour and said that it never varied until the collision. Her testimony was also that the Plymouth struck the truck as the latter was moving slowly out into the intersection after coming up an incline.

Another eyewitness to the accident was Mrs. Janet Voirol who lived three doors south of the intersection where the accident occurred and had just pulled up in front of her house facing the intersection which gave her a view of the Plymouth and the mail truck a few seconds before the collision. She testified that the collision occurred west of the center line of Minnesota Avenue and upon its happening the Plymouth flew up in the air, turned over completely and came back to hit a fire hydrant and lamp post. She saw the vehicles at the same time and the truck was approximately in the middle of the intersection being operated at 10 to 15 miles per hour.

Digar, the driver of the truck, described it as a Metro mail truck and said he was seated about three feet from its front. He was not familiar with the intersection and came to a near stop there, barely moving into the intersection slightly beyond the curb line, because his view was partially obstructed. He looked to the right when he entered the intersection and saw no vehicles coming; then he looked to the left and saw none. He then eased out a little farther in the street and was about to increase his speed when he caught a movement from his right. By that time he was a quarter way out in the intersection—not quite to the center of it—when the collision occurred.

Plaintiffs introduced photographs as exhibits in evidence and they indicate that the view of Digar would have been partially obstructed because of a lamp post on the corner and trees on the side of Minnesota Avenue in the direction from which the Meeks car came.

The testimony of Meeks and the plaintiff passengers in his car added nothing of substance. Meeks' liability was admitted in open court. Marsha May, one of the plaintiff passengers, did not even remember the impact; she said she could not estimate the speed, but the Plymouth was in the intersection when she saw the mail truck entering the intersection. Paula Jones observed the mail truck as the two vehicles were about to collide. Another passenger, Duane Waggoner, did not see the truck prior to impact.

Thus, from the foregoing, it is obvious that the case is a very simple one with considerably less conflict of evidence than usually found in intersectional vehicle accident cases. There is no question about the negligence of Meeks and the sole problem for the trier of the facts was to determine whether or not Digar was guilty of any negligence that contributed to the accident. If it were not for the vigorous charges that the court's findings and conclusions were clearly erroneous, we would be completely justified in affirming the judgment by adopting Judge Harper's opinion with which we thoroughly agree.

■ Plaintiff first assigns as error a claim that there was an abuse of discretion on the part of the trial court in finding that Digar's vision north was at least 60 to 100 feet but failing to find that he could have seen even farther. Plaintiffs in their brief argue that the court should have gone further because it is obvious from the photographs that Digar could have seen at least 162 feet to the north and perhaps all the way to the next block, and that the court abused its discretion by placing Digar's view at 60 to 100 feet. Plaintiffs overlook the context in which Judge Harper commented on this distance. This reference appears at 292 F.Supp. at 579 where Judge Harper said:

"The evidence reveals that at the time that Digar was slightly into the intersection, barely beyond the curb line, the Meeks' car was at least 162 feet away. Digar looked to his right. He

testified that he saw no vehicles approaching, but he further testified that his view was somewhat obstructed. He could not recall the nature of the obstruction. From the plaintiffs' exhibits, particularly 6 and 7, it appears that Digar's line of vision was only partially obscured. He clearly could see at least 60 to 100 feet north on Minnesota. In Burke v. Renick, 249 S.W.2d 513 (St.L.Mo.App.1952), that court ruled that in a situation in which a motorist looked to his left at a point some 15 feet from an intersection and saw no traffic within 60 feet, he had a right to proceed on the assumption that there was no danger from the left and that he did not have to anticipate the approach of a vehicle from that direction at an excessive rate of speed."

Thus, Judge Harper was only demonstrating the right of Digar to continue into the intersection under the existing circumstances. The court did not state in its memorandum that this was the maximum distance Digar could see, but only stated that he could clearly see at least 60 to 100 feet north on Minnesota. There was no abuse of discretion in this finding on the part of the court as it was based on credible testimony and borne out by the photographs appearing in the record as plaintiffs' Exhibits Nos. 6 and 7.

Plaintiffs also assert that the trial court misstated and misapplied the laws of the State of Missouri when the court held that Digar had no duty to stop even if he saw Meeks' vehicle when it was 162 feet away from the intersection. The court found that Digar had a continuing obligation to look ahead and laterally ahead and observe the on-coming traffic, if any, but that he was not under a duty to swing his head from side to side like a pendulum which, of course, would impose an impractical duty upon a motorist. See O'Bryant v. Black & White Cab Co., 350 S.W.2d 833, 837 (K.C. Mo.App.1961). It was held in Burke v. Renick, 249 S.W.2d 513 (St.L.Mo.App. 1952), that when a driver saw no traffic he had a right to proceed on the assumption that there was no danger from that direction and he did not have to anticipate the approach of a vehicle from that direction.[1]

The court's interpretation of Missouri law is also found in Jones v. Fritz, 353 S.W.2d 393 (Spr.Mo.App.1962).[2]

---

1. In Burke v. Renick, 249 S.W.2d 513, 516 (St.L.Mo.App.1952), the court said:
"From that viewpoint it appears that on approaching the intersection Randell slowed down and looked in both directions before starting across; that at a point 15 to ,20 feet before he reached the intersection he looked to his left and saw no northbound traffic within a distance of 60 feet south of the intersection. This gave him the right to assume that there was no immediate danger from the left, for it was not necessary for him to anticipate the approach of a vehicle from the south at an unlawful rate of speed. Then, in obedience to his duty to look in both directions, Harding v. Peterson, Mo.App., 227 S.W.2d 88, loc. cit. 92, Randell looked to his right. Upon entering the intersection, at 20 miles an hour, he again looked to his left, at which time he saw Renick's automobile about to enter the intersection. Since it was his duty to look in both directions, as well as to look ahead, and since it is an impossibility for a person to perform all three acts at once, it was not contributory negligence as a matter of law for Randell to fail to look continually to the south as he crossed the intersection. Harding v. Peterson, supra. Furthermore, we think that reasonable minds might hold that at the time Randell turned his gaze from the south to the north he was entitled to assume that he would enter the intersection before any northbound traffic would do so and that any traffic appearing from the south would yield to him the right of way, when he entered the intersection first, as required by city ordinance. (Citing cases.) It appears to us that the issue was properly submitted to the jury for the reason that reasonable minds could very well differ on the question whether Randell was guilty of contributory negligence."

2. In Jones v. Fritz, 353 S.W.2d 393, 398 (Spr.Mo.App.1962), the court said:
"[A]nd, if plaintiff stopped before entering the intersection, carefully looked ahead and laterally, and then saw no

■ Finally, it is argued that the court's finding that Digar was not guilty of negligence is clearly erroneous. We do not agree. We have thoroughly canvassed the entire record and have no difficulty whatsoever in reaching the conclusion that the court's findings of fact are amply supported by substantial evidence and that its conclusions of law comport with Missouri law which is controlling here. In Whitson v. Yaffe Iron & Metal Corp., 385 F.2d 168, 169 (8th Cir. 1967), this court speaking through Judge Van Oosterhout said:

"We do not try cases de novo upon appeal. With respect to credibility findings, great weight must be given to the fact that the trial court had an opportunity to observe and hear the witnesses. A finding is clearly erroneous only if it is induced by an erroneous view of the law or if substantial evidentiary support is lacking."

In Friedman v. Fordyce Concrete, Inc., 362 F.2d 386, 387–388 (8th Cir. 1966), Judge Matthes articulated our circumscription in cases tried to a court without a jury in relation to Fed.R.Civ.P. 52 (a). On page 387, he characterized the governing rules as axiomatic and held that as a reviewing court we would not retry the issues of fact or substitute our judgment on such issues for that of the trial court; that we would not set aside a finding of fact unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law; and that the complain-

ing party has the burden of demonstrating error in the findings.[3]

■ Since we are convinced that there is an abundance of evidence to justify Judge Harper's finding that this unfortunate accident occurred as a result of the sole negligence of Meeks, that Digar, the Government employee, was completely free of contributory negligence, and, further, that Judge Harper correctly applied the Missouri law, the judgment of the district court is affirmed.

---

vehicles whose approach reasonably appeared to present any danger, her continuing duty to maintain a careful and vigilant lookout ahead and laterally ahead * * * should not be construed as requiring a constant swinging of her head from side to side or an uninterrupted watch toward the south * * * and may not be transmogrified into a mandatory obligation to accomplish the impossible by keeping a continuous lookout in all directions at the same time."

3. "The basic rules to be applied in resolving the question before us are axiomatic.

This court, upon review, will not retry issues of fact, neither will we substitute our judgment on such issues for that of the trial court. We are not permitted to set aside a finding of fact unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. (Citing case.) Findings of fact are presumptively correct and the complaining party has the burden to clearly demonstrate that error exists in the findings of the trial court. (Citing cases.)" 362 F.2d 387–388.